UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSE A. MARINI, JR.,

                Plaintiff,             Civil Action No. 13-10067
                                    Honorable Julian Abele Cook
                                    Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 13]**

      Plaintiff Jose A. Marini, Jr. ("Marini") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [11, 13], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.**      **RECOMMENDATION**

      For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Marini is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [13] be GRANTED, Marini's Motion for Summary Judgment [11] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

II.    **REPORT**

A.    **Procedural History**

On April 14, 2011, Marini filed applications for DIB and SSI, alleging a disability onset date of September 6, 2008.  (Tr. 167-74).  These applications were denied initially on August 2, 2011.  (Tr. 95-103).  Marini filed a timely request for an administrative hearing, which was held on August 9, 2012, before ALJ Kathleen Eiler.  (Tr. 30-64).  Marini, who was represented by attorney John Morosi, testified at the hearing, as did vocational expert Carrie Anderson.  (*Id.*).  On September 13, 2012, the ALJ found that Marini was not disabled.  (Tr. 12-24).  On December 10, 2012, the Appeals Council denied review.  (Tr. 1-5).  Marini filed for judicial review of the final decision on January 8, 2013.  (Doc. #1).

B.    **Background**

1.    *Disability Reports*

In an undated disability report, Marini indicated that his ability to work is limited by a back injury and depression.  (Tr. 212).  Marini reported that these conditions first interfered with his ability to work on September 6, 2008, and that he has not worked since that time.  (*Id.*).

Marini completed high school but had no further education.  (Tr. 213).  Prior to stopping work, he worked as a dietary aide (in both a hospital and a nursing home), a hotel housekeeper, and a machine assistant at a printing company.  (*Id.*).  Marini indicated that he had treated with several medical providers regarding his physical and mental ailments.  (Tr. 215-18).  At the time of the report, he was taking several medications and had had several tests performed (including "nerve tests," x-rays, and MRI/CT scans).  (*Id.*).

In a function report dated May 10, 2011, Marini reported that he lives in a house with family.  (Tr. 232).  When asked to describe his daily activities, Marini indicated that he does light housework, takes care of his children, prepares meals, and runs errands.  (Tr. 233).  When

asked to describe what he could do before the onset of his conditions that he can no longer do, Marini listed bike riding, fishing, playing sports, and going to the gym.  (*Id.*).  His condition interferes with his sleep, but he does not have any difficulties with personal care and does not need reminders to take medication.  (Tr. 233-34).  Marini prepares his own meals (including "simple stuff from a box," sandwiches, and frozen dinners) on a daily basis.  (Tr. 234).  He is able to do light cleaning, wash dishes, and do laundry.  (*Id.*).  He goes outside three or four times a week and is able to drive a car.  (Tr. 235).  He goes grocery shopping, and he is able to pay bills and handle a checking and savings account.  (*Id.*).  He talks with others on the telephone, but is not able to "go out and socialize anywhere."  (Tr. 236-37).

When asked to identify functions impacted by his condition, Marini checked lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, and understanding.  (Tr. 237).  He is able to walk only 2-4 minutes before he needs to stop and rest.  (*Id.*).  He is able to finish what he starts, and he has no great difficulty following written or spoken instructions.  (*Id.*).  He gets along well with authority figures and has never been fired from a job because of problems getting along with other people.  (Tr. 238).[1]

> ### 2.      *Marini's Testimony*

At the time of the August 9, 2012 hearing before the ALJ, Marini was 35 years old.  (Tr. 35).  He lived with his wife and two young children.  (Tr. 36).  Marini testified that he completed high school and took a few college classes but did not obtain a college degree.  (Tr. 39).  He had worked as a dietary aide (in a hospital and nursing home), a hotel housekeeper, and a machine operator.  (Tr. 37).  While working as a dietary aide, Marini injured his back at work; he filed a

---

[1] In a third party function report dated May 11, 2011, Marini's wife, Karrie Marini, generally corroborated Marini's allegations.  (Tr. 244-51).

worker's compensation claim and ultimately received a monetary settlement.  (Tr. 38).  Since his injury, he has not worked at all.[2]  (*Id.*).

Marini testified that he had back surgery (a laminectomy and fusion) in May of 2009.  (Tr. 39-40).  Since that surgery, Marini has continued to experience low back pain; in fact, he testified that his symptoms have "gotten worse."  (Tr. 42).  In addition, he began experiencing neck pain in early 2011 and now has numbness and tingling in his left arm and hand.  (Tr. 48-49).  According to Marini, however, a recent MRI of his cervical spine was essentially unchanged from prior tests.  (Tr. 48-50).

Marini testified that, on a typical day, he tries help his wife care for their children.  (Tr. 45).  This involves preparing meals, light housecleaning, and shopping.  (Tr. 45).  He can lift 20 pounds with "a lot of difficulty" and can stand for 15 minutes at a time.  (Tr. 43, 46).  He has difficulty sleeping at night because of pain and sleep apnea.[3]  (Tr. 53).  He takes two or three naps per day, which vary in length from 20 minutes to two hours.  (Tr. 52).  He has difficulty concentrating and his memory is "horrible" because of his sleep apnea.  (Tr. 57).

Marini takes several medications, including Percocet, Soma, Ultram, Neurontin, Synthroid, Lisinopril, Wellbutrin, and Flonase.  (Tr. 50).  Although Marini takes Wellbutrin for depression, he has not treated with a mental health professional (at the time of the hearing, he was "contemplating to get counseling").  (Tr. 55).  Marini also testified that he experiences anxiety attacks, as well as "flashbacks," which relate to some of the "horrible stuff" he saw growing up in New York.  (Tr. 58-59).

---

[2] Marini testified that, following his back injury, he gained 50 pounds.  (Tr. 47).  At the time of the hearing, Marini – who is 5'6" tall – weighed 235 pounds.  (*Id.*).

[3] Marini has been diagnosed with sleep apnea but now uses a CPAP machine, which helps him sleep "a little better."  (Tr. 53-54).

    *3.    Medical Evidence*

    *(a)    Physical Impairments*

The ALJ found that Marini suffers from the severe physical impairments of degenerative disc disease, sleep apnea, and obesity.[4]  (Tr. 14-15).  Medical evidence pertaining to each of these conditions is discussed below.

In September of 2008, Marini injured his back in a slip and fall accident at work.  (Tr. 355).  A September 22, 2008 MRI of Marini's lumbar spine revealed degenerative changes with a diffusely bulging disc at the L5-S1 level and a left-sided herniated disc arising from the L5-S1 disc space.  (Tr. 310).

In April of 2009, Marini was referred to Dr. Mark Adams, a neurosurgeon.  (Tr. 355-58).  At his intake appointment, Marini was examined by nurse practitioner Helen DeCorte.  (*Id.*).  On examination, Nurse DeCorte observed that Marini had spinous process tenderness in the lumbar spine at L4-L5 and L5-S1, with slight weakness in his left leg.  (Tr. 357).  However, Marini had full range of motion in his neck and lower back, with intact sensation and no neck, thoracic or facet tenderness, as well as negative straight-leg raising.  (*Id.*).  Nurse DeCorte observed that Marini walked with a steady and even gait and could heel and toe walk.  (*Id.*).  She diagnosed Marini with chronic low back pain secondary to left L5-S1 disc herniation.  (Tr. 358).  Consequently, in May of 2009, Marini underwent a lumbar decompressive laminectory at L5-S1 with discectomy and posterolateral fusion.  (Tr. 299).

After surgery, Marini continued to report pain at follow-up appointments with Nurse DeCorte from June 2009 through December 2009.  (Tr. 345-52).  At these appointments, Nurse

---

[4] The ALJ also found that Marini's hypothyroidism and hypertension do not constitute severe impairments under the Act.  (Tr. 15).  Marini has not challenged these conclusions; thus, records pertaining to these conditions will not be discussed in detail herein.

DeCorte consistently observed that Marini exhibited spinous process tenderness at L3-4, L4-5, and L5-S1, but stressed that he retained 5/5 strength in the bilateral upper and lower extremities with negative straight-leg raising.  (*Id.*).  On October 21, 2009, Nurse DeCorte diagnosed Marini with chronic low back pain secondary to failed back surgery syndrome and sent him for an MRI of his lumbar spine.  (Tr. 347-48).  This October 26, 2009 MRI showed degenerative and postsurgical changes at L5-S1, but no evidence of recurrent disc herniation.  (Tr. 361).  When reviewing the results of this MRI in December of 2009, Nurse DeCorte indicated, "I do not really see anything on his MRI that would make me think that there is any issue."  (Tr. 346).

At a follow-up appointment in March of 2010, Dr. Adams observed that Marini had palpable muscle spasms, some straight-leg raising, and reduced range of motion.  (Tr. 344). However, Dr. Adams noted that Marini's recent EMG did "not show one particular nerve that is pinched to the point where further surgery may help him."  (*Id.*).  Dr. Adams noted that Marini might simply need more time to heal from surgery and recommended a "conservative approach." (*Id.*).  In June of 2010, Dr. Adams noted that Marini's x-rays looked good, even though he complained of pain.  (Tr. 343).  By July 28, 2010, Nurse DeCorte observed that Marini had no weakness, with 5/5 strength in the bilateral upper and lower extremities and negative straight-leg raising.  (Tr. 341).  In August of 2010, Dr. Adams reviewed Marini's most recent x-rays and MRI and indicated, "… frankly I had hoped to find something wrong with it that I could attribute his ongoing complaints to, but unfortunately it looks really good."  (Tr. 340).  In September of 2010, Nurse DeCorte reported that Marini's symptoms had not significantly improved since surgery, that he "failed all conservative therapy," and that she did not "really see anything that explains [Marini's] pain."  (Tr. 339).

In November of 2010, Marini underwent a lumbar myelogram and CT scan, which

revealed degenerative changes at L5-S1.  (Tr. 359-60).  After reviewing these studies at a follow-up examination in January of 2011, Dr. Adams concluded that they did not "show significant compression to the point where [he] would recommend any further surgery."  (Tr. 337).  Upon examination, Dr. Adams noted that Marini exhibited positive straight-leg raising, but his strength was relatively well-preserved.  (*Id.*).

In March of 2011, Marini began treating with pain management specialist Dr. John DiBella.  Upon examination, Dr. DiBella diagnosed Marini with ongoing radiculopathy at L5-S1 associated with neural foraminal narrowing.  (Tr. 331, 334).  He administered steroid injections to treat Marini's pain.  (Tr. 332).  Flexion and extension x-rays of Marini's lumbar spine performed on May 13, 2011, showed stable degenerative disc changes at L5-S1 and post L5 laminectomy changes, but no significant abnormalities.  (Tr. 408).  At a follow-up appointment on May 16, 2011, Dr. Adams indicated that he did "not see any instability or changes that would warrant any further surgery" and that Marini had "reached his maximal medical improvement from his back standpoint."  (Tr. 418).  However, Dr. Adams also noted that Marini exhibited some weakness in his left biceps and triceps and ordered an MRI of Marini's cervical spine.  (*Id.*).  This MRI, performed on June 13, 2011, showed multilevel mild spinal canal and neural foraminal narrowing.  (Tr. 419).

On June 1, 2011, Marini underwent a consultative examination with Dr. Scott Lazzara.  (Tr. 439-43).  Dr. Lazzara observed that Marini ambulated with a wide based gait without the use of an assistive device; had mild difficulty with heel and toe walking, standing on either foot, and squatting; and a diminished dorsolumbar spine range of motion.  (*Id.*).  However, Dr. Lazzara noted that Marini had normal motor strength, no difficulty getting on and off the examination table, a full cervical spine range of motion, intact grip strength, and no evidence of joint laxity,

crepitance, or effusion.  (*Id.*).  Dr. Lazarra acknowledged Marini's reports that his left leg went out intermittently but noted that he did not have any weakness in that leg upon examination.  (Tr. 443).  Dr. Lazarra diagnosed Marini with arthritis, determined that his degree of impairment was mild to moderate, and characterized his prognosis as fair.  (*Id.*).

On June 14, 2011, Marini's primary care physician, John Vargas, D.O., reported that Marini had "post-laminectomy syndrome, but has minimal objective findings."  (Tr. 427).  In October of 2011, Dr. Vargas examined Marini and diagnosed him with chronic pain syndrome and failed lumbar laminectomy.  (Tr. 455).

In August of 2011, a physical residual functional capacity ("RFC") assessment was completed.  (Tr. 73-75).  Dr. Daniel Dolanski, a state agency medical consultant, examined Marini's medical records and concluded that he retained the ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for 2 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday.  (Tr. 73).  Dr. Dolanski further opined that Marini could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; could never climb ladders, ropes, or scaffolds; could frequently reach in front and occasionally reach overhead with his left upper arm; and must avoid concentrated exposure to vibration and hazards.  (Tr. 73-75).

Marini underwent physical therapy for his back and neck pain from March of 2012 through July of 2012.  (Tr. 469-94).  By early June, Marini's physical therapist noted that his back pain had decreased.  (Tr. 485).  At his discharge in July, Marini reported a 45% improvement in his symptoms, and his therapist gave him a "fair to good" prognosis for continued improvement.  (*Id.*).  The physical therapist noted that Marini's back condition was improving, but he was being discharged from physical therapy because Dr. Adams was concerned that it could aggravate his cervical condition.  (*Id.*).

8

A June 30, 2012 MRI of Marini's cervical spine showed: (1) straightening of the normal cervical lordosis; (2) disc bulging at C4-5 toward the left causing narrowing of the left neural foramen, with no herniation, canal stenosis, or nerve root impingement; (3) uncovertebral joint facet hypertrophy at C6-C7 causing moderate narrowing of the right neural foramen, but no herniation, canal stenosis, or nerve root impingement; and (4) the remaining levels of the cervical spine were within normal limits. (Tr. 495-96).

Marini also has been treated for sleep apnea. In January of 2012, Dr. Vargas diagnosed Marini with this condition. (Tr. 456-57). In June of 2012, Marini underwent an all-night polysomnogram study, the results of which sleep specialist Dr. Saad Ahmad determined to be consistent with very severe obstructive sleep apnea/hypopnea syndrome. (Tr. 466-67). Dr. Ahmad noted that Marini's sleep-disordered breathing significantly improved with CPAP titration. (Tr. 467). He advised Marini to use the CPAP machine and lose weight. (*Id.*).

### (b)   *Mental Impairments*

In June of 2011, Dr. Vargas indicated that Marini was "depressed because of his pain." (Tr. 425). As a result, on July 19, 2011, Marini underwent a consultative psychological examination with George Pestrue, Ph.D. (Tr. 444-49). Marini reported that he experienced anxiety attacks when he was around groups of people. (Tr. 446). However, he also stated that he got along with his neighbors "pretty well," had about ten good friends, socialized online, and enjoyed using his computer and playing video games. (Tr. 446-47). Marini told Dr. Pestrue that he did household chores (including taking out the garbage, running errands, cooking, and laundry). (Tr. 447). Dr. Pestrue found that Marini was friendly and cooperative with normal speech and good hygiene. (*Id.*). However, Dr. Pestrue also observed that Marini was strongly anxious and tense, moderately to strongly depressed, with a flat affect and poor self-esteem. (Tr.

447-48).   Dr. Pestrue diagnosed Marini with major depression, single episode, moderate, social anxiety disorder, and posttraumatic stress disorder, and assigned a Global Assessment of Functioning (GAF)[5] score of 48.   (Tr. 449).   Dr. Pestrue noted that Marini's medical problems were his primary disability, but that his depression left him "tired and lacking in motivation" and that his "social anxieties will make it difficult for him to work in social situations."   (*Id.*).

On July 27, 2011, state agency psychological consultant Wayne Hill, Ph.D., examined Marini's records and opined that he might perform better alone, in small groups, or under circumstances in which he has only limited (brief and superficial) contact with others.   (Tr. 90). Despite this limitation, Dr. Hill also found that Marini was able to perform one- and two-step tasks on a sustained basis.   (Tr. 91).

### 4.      *Vocational Expert's Testimony*

Carrie Anderson testified as an independent vocational expert ("VE") at the hearing before the ALJ.   (Tr. 60-63).   The VE characterized Marini's past relevant work as a dietary aide, kitchen helper, bindery machine operator, and laundry attendant as unskilled in nature and ranging from light to medium in exertion.   (Tr. 61).   The ALJ asked the VE to imagine a claimant of Marini's age, education, and work experience, who could perform sedentary work, with the following additional limitations:   frequent reaching in front with his left upper extremity; occasional overhead lifting with his left upper extremity; occasional balancing, stooping, crouching, kneeling, crawling, and climbing ramps and stairs; no climbing ladders, ropes, or scaffolds; no concentrated exposure to vibration and workplace hazards; simple, routine, and repetitive tasks; occasional interaction with supervisors and co-workers; and no

---

[5]  GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

interaction with the general public.  (Tr. 61-62).  The VE testified that the hypothetical individual would not be capable of performing Marini's past relevant work.  (Tr. 62).  However, the VE testified that the hypothetical individual would be capable of working in the positions of surveillance monitor (2,800 jobs in Michigan's lower peninsula), paper inserter (15,600 jobs), and "check weigher" (20,100 jobs).  (*Id.*).

### C.    Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

11

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

> **D.      The ALJ's Findings**

Following the five-step sequential analysis, the ALJ found that Marini is not disabled under the Act. At Step One, the ALJ found that Marini has not engaged in substantial gainful activity since September 6, 2008, his alleged onset date. (Tr. 14). At Step Two, the ALJ found that Marini has the severe impairments of degenerative disc disease, sleep apnea, obesity, affective disorder, and anxiety disorder. (Tr. 14-15). At Step Three, the ALJ found that Marini's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 15-17).

The ALJ then assessed Marini's residual functional capacity ("RFC"), concluding that he is capable of performing sedentary work, with the following additional limitations: frequent reaching in front with his left upper extremity; occasional overhead lifting with his left upper extremity; occasional balancing, stooping, crouching, kneeling, crawling, and climbing ramps and stairs; no climbing ladders, ropes, or scaffolds; and no concentrated exposure to vibration and workplace hazards. (Tr. 17-22). In addition, the ALJ limited Marini to performing simple, routine, and repetitive tasks; occasional interaction with supervisors and co-workers; and no interaction with the general public. (*Id.*).

At Step Four, the ALJ determined that Marini is unable to perform his past relevant work.

12

(Tr. 22-23).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Marini is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 23-24).  As a result, the ALJ concluded that Marini is not disabled under the Act.  (Tr. 24).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13;

*Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

Marini makes various arguments as to why he believes the ALJ's physical and mental RFC assessments and final decision are not supported by substantial evidence. The Court will address those arguments in turn.

#### 1.    The ALJ's Physical RFC Assessment is Supported by Substantial Evidence

Marini argues that the ALJ's physical RFC assessment is not supported by substantial evidence. However, the Court finds that the ALJ reasonably found that Marini has the RFC to perform a reduced range of sedentary work. (Tr. 17-22). To support her decision, the ALJ considered objective medical tests, examination records, the state agency reviewing physician's conclusions, and statements from both Marini and his wife. (*Id.*).

First, the ALJ discussed in detail multiple diagnostic images of Marini's back and neck, noting that, in large part, they failed to reveal any objective medical condition that accounted for his ongoing allegations of disabling pain. (Tr. 18). Specifically, the ALJ noted that, after

14

reviewing the results of Marini's October 26, 2009 MRI, Nurse DeCorte indicated, "I do not really see anything on his MRI that would make me think that there is any issue." (Tr. 18, 346). Similarly, the ALJ noted that, at a follow-up appointment in March of 2010, Dr. Adams indicated that Marini's recent EMG did "not show one particular nerve that is pinched to the point where further surgery may help him." (Tr. 18, 344). The ALJ also noted that, in August of 2010, Dr. Adams reviewed Marini's most recent imaging studies and indicated, "… frankly I had hoped to find something wrong with it that I could attribute his ongoing complaints to, but unfortunately it looks really good." (Tr. 18, 340). In addition, the ALJ noted that, after reviewing the results of Marini's November 2010 lumbar myelogram and CT scan, Dr. Adams concluded that they did not "show significant compression to the point where [he] would recommend any further surgery."[6] (Tr. 19, 337). And, the ALJ noted that, after reviewing flexion and extension x-rays of Marini's lumbar spine performed on May 13, 2011, Dr. Adams indicated that he did "not see any instability or changes that would warrant any further surgery" and that Marini had "reached his maximal medical improvement from his back standpoint." (Tr. 19, 418). Finally, the ALJ noted that although a June 2012 cervical spine MRI revealed disc bulging, there was no evidence of herniation, canal stenosis, or nerve root impingement. (Tr. 19, 495-96). In sum, the ALJ thoroughly and extensively discussed the many objective medical test results contained in the record.

---

[6] In his reply brief, Marini argues that both the ALJ and the Commissioner "downplayed the significance" of these objective findings. (Doc. #14 at 2). Specifically, Marini asserts that the November 2010 lumbar myelogram and CT did not merely reveal "degenerative changes," as the Commissioner indicates in her brief, but, rather, revealed retrolisthesis, which, according to Marini, is a "much more dramatic finding than simple 'degenerative changes' …." (*Id.*). This argument is a red herring because, regardless of how the Commissioner characterized the ALJ's findings in her brief, the fact remains that the ALJ explicitly and appropriately discussed the findings of retrolisthesis in her decision. (Tr. 18-19) (citing Dr. Adams' conclusion that the finding of retrolisthesis did not warrant "any further surgery").

Second, the ALJ found that numerous physical examinations supported her conclusion that Marini can perform a reduced range of sedentary work.  For example, the ALJ considered Nurse DeCorte's findings that, between June and October of 2009, Marini exhibited spinous process tenderness at L3-4, L4-5, and L5-S1, but retained 5/5 strength in the bilateral upper and lower extremities with negative straight-leg raising.  (Tr. 18, 345-52).  The ALJ also noted that, on examination, Marini's doctors and nurses could not determine the cause of his pain.  (Tr. 18-19, 339, 340, 343, 344, 346).  The ALJ also considered Dr. Lazzara's reports that Marini ambulated without the use of an assistive device; had only mild difficulty with heel and toe walking; had normal motor strength; had no difficulty getting on and off the examination table; and had a full cervical spine range of motion, intact grip strength, unimpaired dexterity, and no evidence of joint laxity, crepitance, or effusion.  (Tr. 19, 439-43).

Third, the ALJ considered and gave significant weight to the state agency reviewing physician's conclusion that Marini retains the ability perform a reduced range of light work.  (Tr. 21, 73-75).  Marini argues – in conclusory fashion – that the ALJ gave "improper weight" to Dr. Dolanski's opinion in this regard, asserting that "the opinion of a non-examining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physician."  (Doc. #11 at 28).  There are several problems with this argument.  First, Marini does not identify any opinion of any treating physician that is, in fact, contrary to that of Dr. Dolanski or that indicates Marini was more physically limited than determined by the ALJ.  Second, the ALJ reasonably relied on Dr. Dolanski's opinion because state agency medical sources are independent and unbiased, and their opinions are based on familiarity with the disability program, a review of the entire record at the time of the review, and expertise in determining functional limitations.  *See* 20 C.F.R. §404.1527(e)(2)(i).  Finally, Marini ignores the fact that the ALJ ultimately imposed

16

an RFC that was *more generous* than Dr. Dolanski's, limiting Marini to a reduced range of sedentary (not light) work. (Tr. 21).

a.   *The ALJ's Credibility Determination*
*Is Supported by Substantial Evidence*

In arguing that the ALJ's physical RFC finding is not supported by substantial evidence, Marini asserts that the ALJ improperly found him "not fully credible." (Doc. #11 at 21-24). Marini spends more than three full pages of his brief regurgitating the applicable legal standards, but his entire "analysis" of this issue consists of the following statement, in relevant part: "In the instant case … the cited records from Drs. Adams and DiBella all support Plaintiff's complaints concerning his symptoms. There really is no evidence to the contrary. There was and remains no reason to question the credibility of Plaintiff's testimony." (*Id.* at 24). Marini is mistaken.

As the Sixth Circuit has held, determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'" *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)). This Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [Marini's alleged symptoms] are reasonable and supported by substantial evidence in the record." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The ALJ is not required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record. *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). Rather, when a complaint of pain or other symptoms is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, she must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other

17

information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible. *Soc. Sec. Rul.* 96-7p, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

Here, as discussed above, the ALJ found that nothing in the objective medical record explained the cause of Marini's pain. (Tr. 17-22). In addition, the ALJ noted that Marini's extensive daily activities – including caring for his young children, driving, grocery shopping, preparing meals, performing light housework, taking out the garbage, doing laundry, playing video games, and interacting with friends – were "not limited to the extent one would expect given his allegations of disabling symptoms." (Tr. 21, 233-35, 245-50, 446-47). These were appropriate considerations. *See* 20 C.F.R. §404.1529(c)(3)(i) (an ALJ may consider a claimant's activities of daily living in evaluating credibility).

Thus, the ALJ recognized the duty imposed upon her by the regulations and, in addition to Marini's own subjective complaints, she appropriately considered the objective medical evidence and Marini's daily activities. (Tr. 17-22). While Marini might disagree with the ALJ's credibility assessment, he has failed to articulate a basis for overturning that finding, particularly in light of the great weight and deference an ALJ's credibility finding is due on review. *See Kirk*, 667 F.2d at 538; *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001) (ALJ's credibility determination will not be disturbed "absent compelling reason"). Here, where the ALJ gave a reasonable explanation for discounting Marini's credibility, and that explanation is supported by substantial evidence, her credibility finding should not be disturbed.

b.      *The ALJ Properly Considered Marini's Obesity*

Marini also argues that, despite finding that he suffers from the severe impairment of obesity (Tr. 14), the ALJ "essentially ignored" the impact of this condition when formulating his RFC. (Doc. #11 at 25). Marini is incorrect. Social Security Ruling ("SSR") 02-1p provides that

obesity should be taken into account when determining whether or not a claimant's impairment or combination of impairments meets a listed impairment, and when determining the effects of those impairments on a claimant's ability to work. *Soc. Sec. Rul. 02-1p*, 2000 WL 628049, at *3 (Sept. 12, 2002). In this case, the ALJ considered Marini's obesity at each applicable stage of the sequential analysis, as required by SSR 02-1p. For instance, the ALJ considered Marini's obesity at Step Two and determined that it was a severe impairment. (Tr. 14). Then, the ALJ considered Marini's obesity at Step Three, determining that despite this impairment, he did not meet or medically equal a Listing. (Tr. 15). And, finally, the ALJ thoroughly considered Marini's obesity in determining his RFC. Specifically, in formulating Marini's RFC, the ALJ noted that his obesity "limit[ed] his ability to perform work-related activity" and, as a result, imposed numerous exertional and postural limitations. (Tr. 22). Thus, the ALJ duly considered the effects of Marini's obesity on his other impairments, as required by SSR 02-1p. *See, e.g.*, *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 442-43 (6th Cir. 2010).

2.      *The ALJ's Mental RFC Assessment is Supported by Substantial Evidence*

The ALJ also reasonably concluded that Marini's affective and anxiety disorders were not disabling. (Tr. 17-22). In reaching this conclusion, the ALJ noted that Marini had not pursued any ongoing mental health treatment since his alleged onset date. (Tr. 20). The ALJ also considered Marini's reports that he could manage his own money, visit with friends, speak with others on the phone, use an online social network, use a computer, play video games, and watch television and movies. (Tr. 21). In addition, both Marini and his wife reported that he had no great difficulty following written and spoken instructions, and got along well with authority figures. (Tr. 237-38, 249-50).

The ALJ also considered the opinion of Dr. Pestrue, the consultative examiner, in which he opined that Marini's medical problems were his primary disability, but then assigned Marini a

GAF score of 48 and indicated that his social anxieties made it difficult for him to work in social situations.[7]   (Tr. 21-22, 449).   The ALJ reasonably gave "limited weight" to Dr. Pestrue's opinion because he "relied quite heavily on [Marini's] subjective report of symptoms and limitations rather than any actual objective findings."   (Tr. 22).   See 20 C.F.R. §404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").   In addition, the ALJ discounted Dr. Pestrue's opinion to some extent because it was based, in part, on an assessment of Marini's physical impairments, which were "outside Dr. Pestrue's area of expertise and the scope of his psychological consultative examination."   (Tr. 22).   Again, it is proper for an ALJ to discount a medical source opinion about issues outside of the medical source's area of expertise.   *See* 20 C.F.R. §404.1527(c)(5).

Regardless, the ALJ recognized that Marini's mental impairments impacted his ability to work and, as a result, limited Marini to simple, routine, and repetitive tasks; only occasional interaction with supervisors and co-workers; and no interaction with the general public.[8]   (Tr. 17-22).   Citing *Edwards v. Barnhart*, 383 F. Supp. 2d 920 (E.D. Mich. 2005), Marini argues that the ALJ's mental RFC finding – which limited him to simple, routine, and repetitive tasks – did not

---

[7] There are some inherent inconsistencies in Dr. Pestrue's opinion.  For example, in contrast to Dr. Pestrue's opinion that Marini's social anxieties would make it difficult for him to work in social situations, Marini reported that he got along well with his neighbors and had about ten good friends.  (Tr. 446).  Moreover, Dr. Pestrue observed that he was friendly and cooperative during the examination.  (Tr. 447).  Thus, to the extent the ALJ discounted Dr. Pestrue's opinion as inconsistent with his own examination, this was appropriate.  *See* 20 C.F.R. §404.1527(c)(2).

[8] Marini vaguely asserts that "the Depression noted by Dr. Pestrue was not sufficiently accounted for in the RFC," mandating remand.  (Doc. #11 at 26).  This argument lacks merit.  The ALJ considered Dr. Vargas' assessment that Marini was depressed because of pain, Dr. Pestrue's diagnosis of moderate major depression (single episode), and the fact that Marini never sought mental health treatment with a psychologist or counselor.  (Tr. 20, 55, 427, 449).  Marini has not explained how the ALJ's RFC assessment failed to account for his depression and has failed to provide any support for his apparent assertion that his depression had to be specifically referenced in the ALJ's hypothetical to the VE.

adequately address his moderate limitations in concentration, persistence, or pace ("CPP"). (Doc. #11 at 18). It is true that, in certain situations, courts have held that merely limiting a claimant to "simple," "unskilled," or "routine" work is insufficient to address CPP deficiencies.[9] However, under some circumstances, courts have held that limitations similar to those imposed by the ALJ in this case adequately account for such deficiencies. *See, e.g., Bohn-Morton v. Comm'r of Soc. Sec.*, 389 F. Supp. 2d 804, 807 (E.D. Mich. 2005) (finding that "unskilled" work limitation in RFC was sufficient to account for ALJ's finding that claimant "often" experiences issues with CPP); *Edmunds v. Comm'r of Soc. Sec.*, 2010 WL 3633768, at *8 (E.D. Mich. Aug. 17, 2010) (substantial evidence supported ALJ's finding that claimant with moderate CPP deficiencies could perform "simple, routine, repetitive" work).

In this case, the ALJ reasonably determined that Marini's concentration, persistence, and pace were not significantly impaired and did not need to be included in her hypothetical to the VE. The ALJ specifically noted that Marini engaged in activities "that require a fair degree of concentration, persistence, and pace," including caring for his young children, driving, preparing simple meals, managing his own money, using a computer, socializing online, playing video games, and watching television and movies. (Tr. 16, 233-38, 244-51, 439, 446-47). In addition, as the ALJ noted, the state agency psychological consultant opined that Marini did not have "sustained concentration and persistence limitations" and was capable of performing "one and two step tasks on a sustained basis." (Tr. 21, 90-91).

Marini has not explained why more detailed or more specific nonexertional limitations were required in order to adequately account for his alleged deficiencies in CPP. Nor has he offered any suggestion as to what those additional limitations should be. Thus, under the facts of

---

[9] *See, e.g., Benton v. Comm'r of Soc. Sec.*, 511 F. Supp. 2d 842, 849 (E.D. Mich. 2007); *Green v. Comm'r of Soc. Sec.*, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009).

this case, by expressly limiting Marini to simple, routine, and repetitive tasks, the ALJ adequately accounted for Marini's limitations in concentration, persistence, or pace. *See, e.g., Lewicki v. Comm'r of Soc. Sec.*, 2010 WL 3905375, at \*3 (E.D. Mich. Sept. 30, 2010) ("There may be cases where such moderate limitations preclude the performance of even some simple, unskilled tasks. Plaintiff does not, however, explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence, or pace."); *McNamara v. Comm'r of Soc. Sec.*, 2011 WL 7025855, at \*12 (E.D. Mich. Dec. 1, 2011) (finding that a hypothetical limiting claimant to "simple routine tasks consistent with unskilled work" adequately took into account claimant's mental limitations, including moderate limitation in concentration, persistence, or pace); *Young v. Comm'r of Soc. Sec.*, 2011 WL 2601014, at \*10 (E.D. Mich. May 23, 2011) (finding that a hypothetical limiting claimant to routine and repetitive tasks accurately portrayed claimant's moderate limitation in ability to concentrate and perform at a consistent pace).[10]

---

[10] Marini also argues that the ALJ's hypothetical questions were insufficient because they failed to account for all of his credible limitations. (Doc. #11 at 26-27). An ALJ may rely on the testimony of a vocational expert to determine whether jobs would be available for an individual who has particular workplace restrictions. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of a conclusion that the claimant can perform other work, the question must accurately portray the claimant's physical and mental impairments. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). In this case, to the extent Marini argues that his functional limitations were greater than those found by the ALJ, the Court has already rejected that argument. The ALJ posed a complete hypothetical question to the VE – asking her to consider an individual with Marini's age, education, work experience, and RFC – and reasonably accepted the VE's testimony that the hypothetical individual described could perform work that exists in significant numbers in the national economy. This testimony, and the medical evidence and credibility determination discussed above, provide substantial evidence to support the ALJ's finding that Marini was not disabled during the period in question. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (where hypothetical accurately described the plaintiff in all relevant respects, the VE's response to the hypothetical question constitutes substantial evidence).

## III.     CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [13] be GRANTED, Marini's Motion for Summary Judgment [11] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: November 7, 2013                    s/David R. Grand_____
Ann Arbor, Michigan                        DAVID R. GRAND
                                           United States Magistrate Judge

### NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 7, 2013.

                                           s/Felicia M. Moses_____
                                           FELICIA M. MOSES
                                           Case Manager